## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

DEBRA KELLER     )
   Plaintiff,    )
          )
v.          )
          )
REFERENCE SERVICES, INC. and ) Case No. 3:19-cv-177
DAVID STINNETT, individually  )
          )
   Defendants.   )

## COMPLAINT

Plaintiff, Debra Keller, by counsel, WOODEN MCLAUGHLIN LLP, and in support of her Complaint against Defendants, Reference Services, Inc. and David Stinnett, individually, shows unto the Court as follows:

## PARTIES

1. At all times relevant to this action, Plaintiff, Debra Keller ("Keller"), resided within the Southern District of Indiana.

2. Defendant, Reference Services, Inc. ("RSI"), a background screening company, is an Indiana corporation with its principal place of business at 101 Plaza East Boulevard, Suite 300, Evansville, Indiana 47715. RSI regularly conducts business within the Southern District of Indiana.

3. Upon information and belief, Defendant, David Stinnett ("Stinnett"), resides in Charleston, South Carolina. Stinnett is the President and CEO of RSI, a member of RSI's board of directors, and RSI's majority shareholder. Stinnett makes frequent trips to Evansville for RSI business.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this complaint

pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1367; 28 U.S.C. § 1343; 42 U.S.C. § 2000e-

5; and 42 U.S.C. § 12117.

5.      Keller was an "employee" as that term is defined by Title VII of the

Civil Rights Act of 1964 ("Title VII") at 42 U.S.C. § 2000e(f).

6.      Keller was an "employee" as that term is defined by the Americans

with Disabilities Act ("ADA") at 42 U.S.C. § 12111(4).

7.      Keller was an "employee" as that term is defined by the Equal Pay Act

("EPA") at 29 U.S.C. § 203(e)(1).

8.      Keller was a "qualified individual" as that term is defined by the ADA

at 42 U.S.C. § 12111(8).

9.      RSI is an "employer" as that term is defined by the EPA at 29 U.S.C. §

203(d).

10.     RSI is an "employer" as that term is defined by the ADA at 42 U.S.C. §

12111(5).

11.     RSI is an "employer" as that term is defined by Title VII at 42 U.S.C. §

2000e(b).

12.     At all times relevant to this action, Stinnett acted as RSI's agent.

13.     Keller exhausted her administrative remedies by filing Charge No.

470-2019-02747 with the U.S. Equal Employment Opportunity Commission and

Indiana Civil Rights Commission.  Keller received her notice of right to sue letter on

August 19, 2019, and timely filed the instant matter within ninety (90) days of receipt of said notice.

14.     All of the events, transactions, and occurrences pertinent to this lawsuit occurred within the geographical environs of the Southern District of Indiana.  Moreover, Keller resides in the Southern District of Indiana and RSI, of which Stinnett is President and CEO, is a resident Indiana corporation with its principal place of business within the Southern District of Indiana.  Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND

15.     Keller was an employee of RSI continuously from January 30, 2012, until April 26, 2019.  At the time Keller's employment with RSI ended, Keller held the position of Senior Vice President of Compliance.  Throughout her employment, Keller worked out of RSI's Evansville, Indiana, office.

16.     Stinnett founded RSI in 2007, serves as RSI's President and CEO, sits on RSI's board of directors, and is RSI's majority shareholder.  Stinnett is also the trustee of the Stinnett Family Trust ("Trust") which has had ownership interests in RSI.

17.     Stinnett hired Keller and acted as her immediate supervisor throughout her employment.  During the entirety of Keller's employment with RSI, Stinnett directed the day-to-day operations of RSI, and Keller reported directly to Stinnett.

18.     Keller met and exceeded RSI's expectations throughout her tenure with RSI, as evidenced by her various promotions and salary increases.  Keller

brought a significant amount of business revenue to RSI.  Many times over the course of her tenure at RSI, Keller was the leading rainmaker at RSI.

19.     During Keller's employment with RSI, Stinnett subjected Keller to an oppressive, pervasive, and hostile work environment because of Keller's sex and disability, in violation of multiple Federal and State equal employment opportunity laws.  Stinnett routinely harassed, threatened, and intimidated Keller and continued to do so, even after Keller complained to Stinnett and another RSI board member about Stinnett's unlawful harassment and discriminatory conduct.

20.     Stinnett frequently, and as recently as March 28, 2019, emphasized to Keller directly to Keller that he "did not trust women;" that he did not have a great "track record" with women; and that women always "betray" him.  When Keller disagreed with Stinnett, Stinnett would respond with some form of "that's what all the women tell me."  Stinnett often told Keller that he knew she was going to "leave him," which Keller interpreted to mean that Stinnett feared she would resign from RSI.  Stinnett was particularly harsh toward Keller whenever he suspected that Keller even contemplated leaving RSI for other employment.

21.     Stinnett regularly instructed Keller to physically look her "best" in order to effectively represent RSI and close deals.  On one occasion, Stinnett urged Keller, as part of her work responsibilities, to undergo an expensive and experimental weight loss program, at Stinnett and/or RSI's costs.  When Keller declined, Stinnett expressed his disappointment.

22.     Stinnett also expected Keller to style her hair in certain ways and

instructed her accordingly.  Stinnett frequently and on multiple occasions

complained of – and called out to Keller in meetings with other RSI employees – a

strand of hair that tended to fall in Keller's face.  Stinnett threatened to "take care

of" the loose piece of hair himself if Keller did not "take care of it" herself.  Stinnett's

criticisms in this regard were so harsh and frequent that Keller re-lives those

events every time her hair falls in her face.  On another occasion, Keller attempted

to escape Stinnett's criticism of her hair by styling her hair in an "up do" instead.

But, Stinnett expressly told Keller that it "wasn't a good look for her," prior to

Keller's handling a client pitch meeting.  Later that same day, after the meeting,

Stinnett blamed Keller and her "up do" for what he deemed a failed client pitch.

23.     Additionally, Stinnett expressly communicated expectations for all

women in RSI's Evansville office to be physically attractive in appearance.  On one

occasion, Stinnett yelled at Keller after Stinnett met the new receptionist Keller

had hired and exclaimed, "Can you not see she is fat?!"  On another occasion,

Stinnett yelled at Keller for hiring a woman of an advanced age.  Stinnett told

Keller that she could not "hire people who look like they should be in a nursing

home."  Stinnett also instructed Keller to tell another female employee with

naturally white hair to dye her hair and wear make up to work.  At Stinnett's

suggestion, RSI gifted the female employees Mary Kay® make-up for the holidays,

and Stinnett encouraged them to use it for work.

24.     Stinnett also criticized the mannerisms of Keller and other female

employees.  Stinnett told Keller that she made herself look "stupid" because,

according to Stinnett, Keller "nodded excessively" in meetings.  Stinnett also requested that Keller, along with an RSI board member and RSI's Vice President of Finance and Human Resources, "coach" another female employee to train her voice. Stinnett stated that the female employee's natural voice sounded "stupid" and "ditzy."

25.    During her tenure at RSI, Keller generated a significant percentage of RSI's business; however, she was paid less than her male colleagues for equal work in jobs that required equal or less responsibilities and duties.  In April of 2019, Stinnett admitted to Keller that he realized he should have been paying her more during her tenure at RSI.

26.    Upon information and belief, no male employees of RSI were criticized for their weight, voice, hair, aged appearance, or mannerisms, nor were male employees instructed to achieve a certain appearance, hair style, or weight in order to effectively represent RSI.  Neither Stinnett nor RSI blamed physical attributes of male employees for lost business opportunities.

27.    In addition to his workplace behavior, Stinnett often called and/or texted Keller during non-business hours and inquired into her whereabouts or plans.  Stinnett continued to contact Keller outside of work even after Keller and Keller's husband informed Stinnett that Keller did not want to be contacted by him at such hours unless it was urgent and business-related.

28.    On or about March 7, 2019, Stinnett called Keller while she was at lunch with an RSI colleague.  Stinnett demanded to know if Keller was having

lunch with a potential new employer.  When Keller explained that she was simply lunching with another RSI employee and they were discussing RSI business, Stinnett reminded Keller that he did not "trust women."  When Keller asked Stinnett how he knew where she was located, Stinnett told her in an intimidating manner that he had his "sources," which Keller interpreted to mean that Stinnett, or someone working for Stinnett, was following her, or at least Stinnett wanted Keller to believe that was the case.  Previous to that event, Stinnett had asked Keller if he could put a location tracking application on her personal cell phone in order to monitor her location.  Keller declined and told Stinnett such a request was an invasion of her privacy and inappropriate.

29.     Keller complained directly to Stinnett on multiple occasions about his discriminatory comments, criticisms, harassment, intimidation, and unreasonable and difficult working conditions.  Keller communicated to Stinnett her belief that he was unfairly targeting her because she was a woman.  Keller also explained to Stinnett that she felt he was targeting her specifically as a woman to undermine her confidence and self-worth in order to take advantage of her loyalty to RSI. Keller likewise communicated these complaints to the RSI board on more than one occasion.

30.     Stinnett was not reprimanded or disciplined following any of Keller's complaints, nor did Stinnett change his behavior.  Instead, Keller's complaints were met with retaliation.

31.     In an attempt to remove herself from the hostile and harassment-laden

work environment created by Stinnett in his capacity at RSI, Keller attempted to resign in August of 2018 and notified Stinnett of her intent to leave RSI.  In response, Stinnett admitted to Keller that his conduct towards her was harmful and that he was a "bad manager."  Stinnett promised Keller that if she stayed with RSI, he would completely remove himself as her immediate supervisor and cease his harassing conduct.  Keller decided to stay with RSI in reliance upon Stinnett's promises, but Stinnett did not change his behavior and the work environment did not improve.

32.     As a direct result of Stinnett's near constant harassment and discrimination, Keller's mental health suffered.  Keller sought treatment for her mental health and informed Stinnett that she was seeking help as a result of Stinnett's behavior toward her and the hostile work environment he created at RSI.

33.     To obtain necessary treatment, Keller properly and in advance requested time off to attend therapy appointments to treat her medical conditions. As a result of Keller's requests for specific times away from the office, Stinnett knew the exact times and dates of Keller's therapy appointments.  In disregard for Keller's mental health and legal rights, Stinnett contacted Keller multiple times during her appointments.  Keller asked Stinnett not to contact her when she was with her doctor, but Stinnett did not heed Keller's request. Instead, Stinnett intentionally timed his calls during Keller's therapy appointments.  When Keller did not answer, Stinnett would call back, multiple times over.  Stinnett's interference with Keller's appointments was intentional and malicious.

34.     As a direct result of Stinnett's actions and RSI's failure to address her complaints about Stinnett's behaviors, Keller continues to suffer from depression, anxiety, panic attacks, and stress.  Keller is in ongoing therapy and is not currently working.

35.     In September 2018 Keller took a leave of absence from RSI on the recommendation of her doctor.  Although Stinnett was aware of exactly why Keller was on leave, Stinnett and other RSI employees, at Stinnett's direction, contacted Keller on multiple occasions during her leave.  Such contact was not business-related or of an urgent nature.

36.     In early April 2019, as a result of Stinnett's harassment and discriminatory criticisms, Keller reached a point where she felt that her continued employment with RSI and exposure to Stinnett's ceaseless harassment would exacerbate her psychological medical conditions and lead her to take her own life. Keller felt she had no choice but to leave her employment in order to escape the hostile work environment created by Stinnett and permitted by RSI.  On April 12, 2019, Keller informed Stinnett that her last day of employment would be April 26, 2019. Stinnett expressed outrage at Keller's decision.

37.     On April 22, 2019, Keller informed Stinnett that her mental health had further deteriorated as a result of his continuing harassment and intimidating conduct.  Keller again asked Stinnett not to contact her outside of business hours. Despite her request, Stinnett repeatedly contacted Keller.

38.     On April 24, 2019, Stinnett contacted Keller at her home outside of

business hours.  Stinnett implored Keller to stay at RSI and renewed his promise to stop serving as Keller's immediate supervisor.  Stinnett also offered Keller an ownership percentage in RSI and suggested discussions could be had on an increase in pay.  Keller declined Stinnett's offers.  Keller's rejection infuriated Stinnett, who started yelling and cursing at Keller.  Stinnett threatened legal action against Keller if she followed through and left her employment at RSI.  When Keller asked why Stinnett would sue Keller, Stinnett stated that he would "find a reason."

39.    On May 17, 2019, Keller filed a Charge of Discrimination, No. 470-2019-02747 ("Charge"), with the Equal Employment Opportunity Commission ("EEOC") and Indiana Civil Rights Commission.  The EEOC acknowledged receipt of Keller's Charge on May 20, 2019.

40.    On June 5, 2019, less than twenty (20) days after Keller filed her Charge, RSI's attorney at the law firm of KAHN DEES DONOVAN & KAHN LLP ("RSI's Original Attorneys") sent Keller a demand letter and threatened legal action against her.

41.    On June 28, 2019, RSI, now by attorneys other than RSI's Original Attorneys, filed a Verified Complaint ("State Court Verified Complaint") in Vanderburgh County Circuit Court, instigating lawsuit No. 82C01-1906-PL-3501 against Keller.

42.    Stinnett, as President and CEO of RSI, verified the State Court Verified Complaint and attested "that the foregoing factual allegations are true and correct."

43.     On or about August 12, 2019, Stinnett contacted the 2019 Programs Chair of the Society for Human Resource Management ("OH SHRM") Ohio Chapter by phone.  The organization had previously invited and scheduled Keller to speak at its 2019 Human Resources Conference set to occur on September 18 – 20, 2019. Stinnett informed the Programs Chair that Keller had been "restrained" from speaking at any SHRM events, yet no such order had been entered by any Court at the time of Stinnett's call.  Stinnett further offered to fill Keller's slot at the OH SHRM Conference with an RSI employee Stinnett described as more credentialed than Keller.

44.     Upon information and belief, Stinnett also communicated similar false information to the Indiana Chapter of SHRM ("IN SHRM") in advance of its Conference set for August 12 – 14, 2019.  IN SHRM had also invited and scheduled Keller to speak at its 2019 Conference.

## COUNT I – SEX DISCRIMINATION

45.     Keller restates and incorporates by reference, as if fully stated herein, paragraphs one (1) through forty-four (44) of her Complaint.

46.     Keller is an employee of RSI, as defined in 42 U.S.C. § 2000e(f).

47.     RSI is an employer, as defined in 42 U.S.C. § 2000e(b).

48.     RSI and its President, CEO, and majority shareholder, David A. Stinnett subjected Keller to knowingly unwelcome and severe or pervasive sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000e, *et seq*.

49.      RSI and its President, CEO, and majority shareholder David A. Stinnett, subjected Keller to a hostile work environment because of Keller's sex, in violation of Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000e, *et seq*.

50.      RSI and its President, CEO, and majority shareholder David A. Stinnett, discriminated against Keller in the terms and conditions of her employment because of her sex, in violation of Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000e, *et seq*.

51.      As a result of the intolerable work conditions created by RSI and David A. Stinnett because of Keller's sex Keller was constructively discharged from her employment with RSI. Such conditions were subjectively and objectively unbearable..

52.      RSI did not have legitimate, non-discriminatory reasons for its unlawful treatment of Keller.

53.      RSI did not take such adverse actions against similarly-situated male employees.

54.      Keller has been and continues to be damaged by RSI's and Stinnett's unlawful actions and inactions.

## COUNT II – RETALIATION (SEX DISCRIMINATION)

55.      Keller restates and incorporates by reference, as if fully stated herein, paragraphs one (1) through fifty-four (54) of her Complaint.

56.     Keller repeatedly opposed unlawful sex discrimination when she complained of such discrimination to her immediate supervisor, David A. Stinnett, and RSI's board.

57.     Keller participated in protected activity when she complained of unlawful discrimination and when she filed Charge No. 470-2019-02747 on May 17, 2019.

58.     RSI and its President, CEO, and majority shareholder David A. Stinnett, retaliated against Keller for opposing unlawful sex discrimination when they subjected her to harassment on the basis of her sex and an increasingly hostile work environment after she complained that Stinnett's harassment negatively affected her mental health, in violation of 42 U.S.C. § 2000e-3(a).

59.     RSI and its President, CEO, and majority shareholder David A. Stinnett, retaliated against Keller for opposing unlawful sex discrimination when they threatened legal action after she complained that Stinnett's harassment negatively affected her mental health, in violation of 42 U.S.C. § 2000e-3(a).

60.     RSI and its President, CEO, and majority shareholder David A. Stinnett, retaliated against Keller for participating in protected activity when it threatened and subsequently filed case No. 82C01-1906-PL-3501 in retaliation for Keller filing a Charge of Discrimination with the Equal Employment Opportunity Commission and Indiana Civil Rights Commission, which alleged discrimination on the basis of sex, in violation of 42 U.S.C. § 2000e-3(a).

61.     Keller has been and continues to be damaged by RSI and Stinnett's unlawful actions and/or inactions.

## COUNT III – DISABILITY DISCRIMINATION

62.     Keller restates and incorporates by reference, as if fully stated herein, paragraphs one (1) through sixty-one (61) of her Complaint.

63.     Keller is an employee, as defined in 42 U.S.C. § 12111(4).

64.     RSI is an employer, as defined in 42 U.S.C. § 12111(5).

65.     Keller is a qualified individual, as defined in 42 U.S.C. § 12111(8).

66.     During a significant portion of her employment with RSI, Keller suffered from depression, anxiety, panic attacks, and stress, all of which substantially limited one or more of her major life activities.  Such impairments meet the definition of disability, as defined in 42 U.S.C. § 12102.

67.     RSI and its President, CEO, and majority shareholder David A. Stinnett unlawfully failed to reasonably accommodate Keller's known disabilities when Stinnett intentionally, repeatedly, and incessantly interrupted Keller's medical treatment, in violation of 42 U.S.C. § 12112.

68.     RSI and its President, CEO, and majority shareholder David A. Stinnett unlawfully subjected Keller to a hostile work environment because of her disability, in violation of 42 U.S.C. § 12112.

69.     RSI did not have legitimate, non-discriminatory reasons for its unlawful treatment of Keller.

70.     Keller has been and continues to be damaged by RSI and Stinnett's unlawful actions and/or inactions.

## COUNT IV – RETALIATION (DISABILITY DISCRIMINATION)

71. Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through seventy (70) of her Complaint.

72. Keller participated in protected activity when she filed a Charge of Discrimination with the Equal Employment Opportunity Commission and Indiana Civil Rights Commission, alleging discrimination on the basis of disability.

73. RSI and its President, CEO, and majority shareholder David A. Stinnett, unlawfully retaliated against Keller for filing a Charge of Discrimination when it first threatened and then filed case No. 82C01-1906-PL-3501 against Keller in state court, in violation of 42 U.S.C. § 12203(a).

74. RSI and its President, CEO, and majority shareholder David A. Stinnett, unlawfully interfered with Keller's legal right to receive a reasonable accommodation for her disabilities, in violation of 42 U.S.C. § 12203(b).

75. Keller has been and continues to be damaged by RSI and Stinnett's unlawful and retaliatory actions.

## COUNT V – EQUAL PAY ACT

76. Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through seventy-five (75) of her Complaint.

77. Keller is an employee, as that term is defined in 29 U.S.C. § 203(e)(1).

78. RSI is an employer, as that term is defined in 29 U.S.C. § 203(d).

79. RSI paid male employees, who worked in substantially similar conditions as Keller, more than Keller for substantially equal work, in violation of 29 U.S.C. § 206(d)(1).

80.     Keller has been and continues to be damaged by RSI's actions and/or inactions.

## COUNT VI – DEFAMATION

81.     Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through eighty (80) of her Complaint.

82.     In paragraphs 29 and 47 of the State Court Verified Complaint, as verified by Stinnett, RSI alleged that Keller was guilty of criminal conduct.  Such allegations are false and malicious.  Such State Court Verified Complaint was published as a matter of public record.

83.     In paragraphs 21, 33, and 39 of the State Court Verified Complaint, as verified by Stinnett, RSI falsely and maliciously accused Keller of breaching fiduciary duties owed to her employer as a function of her occupation.  Such Complaint was published as a matter of public record.

84.     In paragraphs 21, 27, 32, and 36 of the Complaint, as verified by Stinnett, RSI falsely and maliciously accused Keller of breaching a contract executed as a function of her employment and occupation.  Such Complaint was published as a matter of public record.

85.     RSI's allegations, as verified by Stinnett, constitute defamation *per se*.

86.     Stinnett contacted human resources groups to disparage Keller. In his communications with OH SHRM and IN SHRM, Stinnett falsely and maliciously accused Keller of misconduct in her profession and/or occupation.  Stinnett's communications constitute defamation *per se*.

87.        Keller has been and continues to be damaged by RSI and Stinnett's actions and defamatory communications.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

88.        Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through eighty-seven (87) of her Complaint.

89.        RSI, through its President, CEO, and majority shareholder David A. Stinnett, and David Stinnett, individually, intentionally engaged in extreme and outrageous conduct, which both RSI and Stinnett knew would likely result in emotional distress, and that conduct that did indeed cause severe emotional distress in Keller.

90.        Keller has been and continues to be damaged by RSI and Stinnett's extreme and outrageous actions.

## COUNT VIII – NEGLIGENCE

91.        Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through ninety (90) of her Complaint.

92.        RSI and Stinnett owed Keller a duty of reasonable care.

93.        Stinnett breached his duty of care through frequent, repetitious, outrageous, and hostile acts of harassment and retaliation, which continued even after he was made aware of the severe impact his actions had on Keller.

94.        Stinnett's conduct was the "but for" cause of Keller's injuries and Keller's injuries were likewise proximately caused by Stinnett's conduct.

95.      RSI breached its duty of care by permitting its employee and/or agent, Stinnett, to continue engaging in outrageous and hostile acts of harassment and retaliation, even after it had knowledge of Stinnett's actions and the severe impact such actions had on Keller.

96.      RSI's breach was the "but for" cause of Keller's injuries and Keller's injuries were likely proximately caused by RSI's breach.

97.      Keller has suffered significant damages already and has been and continues to be damaged by RSI and Stinnett's negligence.

## COUNT IX – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

98.      Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through ninety-seven (97) of her Complaint.

99.      A valid employment relationship existed between Keller and RSI.

100.      Stinnett knew of the existence of Keller's employment relationship with RSI.

101.      Although Keller informed Stinnett that she may have to terminate her employment with RSI in order to escape his constant, harassing behaviors and preserve her deteriorating mental health, Stinnett, intentionally and without justification, continued to subject Keller to pervasive, hostile, harmful, and unlawful harassment.  Such conduct substantially interfered with Keller's employment relationship with RSI.

102.      A valid business relationship existed between Keller and OH SHRM.

103.      As evidenced by Stinnett's direct communication with OH SHRM, Stinnett knew of the business relationship between Keller and OH SHRM.

104.      Stinnett, intentionally and without justification, contacted OH SHRM in order to accuse Keller of misconduct and persuade OH SHRM to not permit Keller to speak at its future conferences.  Such conduct substantially interfered with Keller's business relationship with OH SHRM.

105.      A valid business relationship existed between Keller and IN SHRM.

106.      As evidenced by his direct communication with IN SHRM, Stinnett knew of the business relationship between Keller and IN SHRM.

107.      Stinnett, intentionally and without justification, contacted IN SHRM in order to accuse Keller of misconduct and persuade IN SHRM to not permit Keller to speak at its future conferences.  Such conduct substantially interfered with Keller's business relationship with IN SHRM.

108.      At all times relevant to the issues herein, Stinnett acted within the course and scope of his employment.

109.      Keller has been and continues to be damaged by Stinnett's wrongful and intentional interference.

## COUNT X – RESPONDEAT SUPERIOR

110.      Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through one hundred nine (109) of her Complaint.

111.     David A. Stinnett, as the President, CEO, principal board member, and controlling shareholder of RSI, was RSI's employee and/or agent at the time Stinnett engaged in extreme and outrageous conduct outlined herein.

112.     Stinnett engaged in such tortious and unlawful conduct within the course and scope of his employment and/or agency with RSI.

113.     As Stinnett's employer and/or master, RSI is vicariously liable for Stinnett's tortious conduct.

114.     Keller has been and continues to be damaged by Stinnett's extreme and outrageous tortious and unlawful conduct.

## COUNT XI – PREJUDGMENT ATTACHMENT OF DEFENDANTS' ASSETS

115.     Keller restates and incorporates, as if fully stated herein, paragraphs one (1) through one hundred fourteen (114).

116.     RSI is the mere alter ego of Stinnett.  Stinnett controls all financial aspects of RSI.  Stinnett used RSI as an instrument to direct unlawful harassment, discrimination, and tortious or otherwise unlawful conduct against Keller.  Allowing Stinnett to use RSI's corporate form as a shield against personal liability in this matter would promote injustice.

117.     In *Northwestern Mutual Life Insurance Company v. Policyowner Protection Services, Inc., David A. Stinnett et al.*, No. 1:05-CV-0299-LJM-TAB the United States District Court for the Southern District of Indiana entered a monetary judgment against Stinnett for $28,174,289.94 in damages.  *See* Filing No. 177, at ECF p. 2.

118.     Upon information and belief, Stinnett has not satisfied the judgement.

119.    Upon information and belief, RSI's assets are totally within Stinnett's control and as such, are also substantially at risk of total depletion by Stinnett, who may deplete RSI's assets or intentionally undercapitalize the corporation in an attempt to avoid a meaningful monetary recovery by Keller from RSI in the instant litigation.

120.    As a result of the outstanding judgment lien against Stinnett personally, Stinnett is likely without sufficient funds to personally compensate Keller for the damages Stinnett has caused; therefore, if Stinnett's and/or RSI's assets are depleted during the pendency of this litigation, Keller will be left without an avenue for meaningful monetary recovery.

121.    Upon information and belief, RSI's and Stinnett's net assets, together with the costs of this action and anticipated injunctive relief, may be insufficient to satisfy a predictable, substantial money damages judgment rendered in favor of Keller following the trial of this action.

122.    As such, Keller seeks pre-judgment attachment of RSI's assets having the value of Keller's estimated damages, to be determined at a pre-trial hearing.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff, Debra Keller, respectfully requests that this Court enter judgment against Defendants and in her favor and provide her the following relief:

1.    Front and back pay;

2.    All lost wages, benefits, compensation, and monetary loss suffered as a result of the Defendants' unlawful actions;

3.       All compensatory, consequential, and punitive damages;

4.       All attorneys' fees, litigation expenses, and costs incurred as a result of this action;

5.       Pre- and post- judgment interest on all sums recoverable; and

6.       All other legal and/or equitable relief to which she is entitled.

**PURSUANT TO FED. R. CIV. P. 38(b), PLAINTIFF DEMANDS JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

/s/ *Crystal S. Wildeman*
Crystal S. Wildeman, # 26603-82
Alyson M. St. Pierre, #35375-53
Robert J. Simmons, #29066-29

Attorneys for Plaintiff, Debra Keller

WOODEN MCLAUGHLIN LLP
25 NW Riverside Drive
Suite 310
Evansville, IN 47708
Tel: (812) 401-6151
Fax: (812) 401-6444
Crystal.Wildeman@woodenlawyers.com
Alyson.StPierre@woodenlawyers.com
Robert.Simmons@WoodenLawyers.com